**SUPERIOR COURT**
**OF THE**
**STATE OF DELAWARE**

T. HENLEY GRAVES
*JUDGE*

**SUSSEX COUNTY COURTHOUSE**
**1 THE CIRCLE, SUITE 2**
**GEORGETOWN, DE 19947**
**TELEPHONE (302) 856-5257**

February 10, 2015

Gorettie Norgues
*Pro se Appellant*
610 S. Westover Drive
Salisbury, MD 21801

Paige J. Schmittinger
Deputy Attorney General
Department of Justice
Carvel State Building
820 N. French Street
Wilmington, DE 19801

RE:   *Layfield v. Mountaire Farms of Delaware, Inc.* C.A. No. S14A-05-004 THG

Dear Parties:

Before the Court is an appeal from the Unemployment Insurance Appeals Board ("UIAB") with regard to claimant Gorettie Norgues's ("Claimant") denial of unemployment insurance benefits. For the reasons that follow, the Board's decision is **AFFIRMED**.

**FACTS AND PROCEDURAL HISTORY**

Claimant was employed by Mountaire Farms ("Employer") as a General Laborer from May 27, 2010 through December 10, 2013; she was a full-time employee and earned $11.50 per hour.[1] Claimant worked in the "thigh d-bone" department at Employer.[2] There, Claimant worked on a line with 11 other employees.[3] On the day of her termination, she was the last person on the line.[4] The

---

[1] R. at 52.

[2] R. at 1.

[3] R. at 87.

[4] *Id.*

1

last person on the line reviews the final product and makes sure that no chicken meat has any extra bones or skin in and on it before packaging.[5] Claimant was brought down to Employer's Human Resources office ("HR") by her supervisor for an oral reprimand.[6] According to Claimant, a piece of chicken made it down the line with a bone, and she was singled out by her supervisor.[7] Employer claims Claimant was brought down to HR so they could use an interpreter[8] to let her know what she did wrong; this was the first time Employer ever had a problem with Claimant's work performance.[9]

Claimant was asked to sign a warning notice, which she refused.[10] She alleges that upon refusal, she was asked for her employee identification ("ID"), which she was reluctant to turn over out of fear of being terminated.[11] She claims she was fearful due to alleged statements made by others in her department along the lines of they "did not want an old lady on their team."[12] Employer, however, maintains that Claimant was only receiving an oral warning for her work performance, but her reaction turned into a commotion, which ultimately resulted in her termination.[13]

When brought in to HR for her oral warning, Claimant started "going off," cussing and

---

[5] R. at 87-88.

[6] R. at 53.

[7] R. at 1; R. at 53.

[8] It should be noted that Claimant only speaks Creole.

[9] R. at 89.

[10] R. at 53.

[11] R. at 91.

[12] *Id.*

[13] R. at 92.

screaming at her supervisors, telling them to "kiss my ass" and referring to them as "motherfuckers."[14] Claimant's supervisors asked her to calm down and instructed her to give them her ID as a result.[15] She refused and continued to use profanity towards them.[16] This tyraid carried over into the hallway during a shift change, disrupting the flow of employee traffic.[17] Several outside prospective employees, who were waiting for interviews at Employer, also observed the scene unfold.[18] Claimant was eventually brought back into HR and told that she would be suspended from work pending a company decision as to her termination.[19] She was asked to sign paper work with regard to her suspension, but she refused signature.[20] Claimant was then asked to leave the building and was escorted off the property after Employer threatened to call the police.[21]

When Claimant was hired, she received copies of Employer's employment police in both English and Creole.[22] Employer's policy noted, specifically, that "[f]ighting or using obscene, abusive, or threatening language or gestures," and "[e]ngaging in insubordination, including refusal to perform assignments," were actions Employer found inappropriate.[23] Employer's policy also

---

[14] R. at 88; R. at 24; R at 21.

[15] R. at 21.

[16] *Id.*

[17] R. at 88.

[18] R. at 26.

[19] R. at 26.

[20] *Id.*

[21] R. at 28; 53.

[22] R. at 57-66.

[23] R. at 57.

3

states "[i]f your performance, work habits, overall disposition or conduct becomes unsatisfactory in the judgment of [Employer], based on violations either of the above or any other [Employer] polices, rules, or regulations, you will be subject to disciplinary action, up to and including termination."[24] Claimant signed an acknowledgment that she had received the policies and was aware what conduct was acceptable and the range of disciplinary actions that could be taken.[25]

Claimant filed for Unemployment Insurance Benefits on December 13, 2013.[26] On December 23, 2013, Employer filed a separation notice, pursuant to 19 *Del. C.* §3317, explaining Claimant was terminated for insubordination.[27]  As a result, the Claims Deputy ("Deputy") denied Claimant benefits, determining that she was discharged for just cause.[28]  Claimant timely appealed, pursuant to 19 *Del. C.* §3318.[29] The Claims Referee ("Referee") affirmed the Deputy's decision.[30]  Claimant then filed a timely appeal to the UIAB, which affirmed the decision of the Referee.[31]  Claimant has subsequently filed an appeal with this Court pursuant to 19 *Del. C.* §3323.[32]

## STANDARD OF REVIEW

When reviewing appeals from the UIAB, this Court examines only the record upon which

---

[24] *Id.*

[25] R. at 62-64.

[26] R. at 1.

[27] R. at 5.

[28] R. at 8-9.

[29] R. at 12.

[30] R. at 54.

[31] R. at 92.

[32] R. at 97.

4

the UIAB relied in making its decision.[33] The Court must ascertain whether the UIAB's conclusions are supported by substantial evidence and free from legal error.[34] The necessary degree of evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[35] "To prevail on appeal, the appellant must show the Board committed an error of law or demonstrate the findings of the Board are not supported by substantial evidence" in the record.[36] Where a party with the burden of proof fails to convince the UIAB, the resulting factual findings can only be overturned by the Court due to errors of law, inconsistences, or capricious disregard for competent evidence.[37] Evaluating the evidence, determining credibility issues, and deciphering factual questions are not within the Court's purview.[38] "Consequently, if there is substantial evidence and no legal error, the court will affirm the Board's decision."[39]

## Discussion

The Delaware General Assembly has determined that:

> [E]conomic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of [Delaware]. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the General Assembly to prevent its spread and to lighten the burden which now so often falls with crushing force upon the unemployed worker and the worker's family. . . . The General Assembly therefore declares that in its considered judgment the public

---

[33] *Burgos v. Perdue Farms, Inc.*, 2011 WL 1487076, *2 (Del. Super. Apr. 19, 2011).

[34] *Behr v. Unemployment Ins. Appeal Bd.*, 1995 WL 109026, *1 (Del. Super. Feb. 7, 1995).

[35] *Moss v. Mountaire Farms*, 2014 WL 4933060, *2 (Del. Super. Sept. 29, 2014).

[36] *Behr*, 1995 WL 109026 at *1.

[37] *Id.*

[38] *Burgos*, 2011 WL 1487076 at *2.

[39] *McCoy v. Occidental Chemical Corp.*, 1996 WL 111126, *3 (Del. Super. Feb. 7 1997).

good and general welfare of the citizens of this State require the enactment of this measure.[40]

In recognizing the risk unemployment poses on the community, the General Assembly created an "unemployment reserve" to be used for the benefit of workers who become unemployed through no fault of their own.[41]

## Denial of Benefits

Benefits from Delaware's Unemployment Compensation Act ("the Act") are "only available to those involuntarily unemployed without just cause and those voluntarily unemployed for good cause.[42] As such:

> An individual shall be disqualified for benefits [f]or the week in which the individual was discharged from the individual's work for just cause in connection with the individual's work and for each week thereafter until the individual has been employed in each of 4 subsequent weeks (whether or not consecutive) and has earned wages in covered employment equal to not less than 4 times the weekly benefit amount."[43]

In sum, an employee that has been fired for just cause is disqualified from receiving state benefits for a specified period of time based on the subsequent wages she makes.

Just cause to discharge an employee is defined as a "wilful or wanton act in violation of either the employer's interest, or of the employee's duties or the employee's expected standard of conduct."[44] "Wilful or wanton conduct requires a showing that one was conscious of his conduct or recklessly indifferent of its consequences; it need not necessarily connote bad motive, ill design or

---

[40] 19 *Del. C.* §3301.

[41] *Id.*

[42] *Powell v. Autotote Sys.*, 1995 WL 465328, *2 (Del. Super. July 18, 1996).

[43] 19 *Del. C.* §3314(2).

[44] *McCoy*, 1996 WL 111126 at *3.

6

malice."[45] When the employer's decision to terminate the employee rests on misconduct, the burden lies with the employer to establish that misconduct.[46]

An employee's expected standard of conduct is relevant to determining whether there is just cause for the discharge.[47] As such, a violation of a reasonable company policy may constitute just cause for termination as long as the employee is aware the policy exists and that discharge is a possible consequence for its violation.[48] The Court, in determining whether a violation of a company policy is just cause for discharge, is required to go through the two step analysis outlined in *Parvusa v. Tipton Trucking Co.*, 1993 WL 562196 (Del Super. Dec. 1, 1993).[49] The Court must determine: "1) whether a policy existed, and if so, what conduct was prohibited and 2) whether the employee was apprised of the policy, and if so how was he made aware."[50] "Knowledge of a company policy may be established where there is evidence of a written policy, such as an employer's handbook, . . ., or where an employee had been previously warned regarding the objectionable conduct."[51] However, "the absence of advanced warning concerning the Consequences [*sic*] of given acts, as opposed to notice of their impropriety, does not preclude a discharge for wilful misconduct."[52]

## Procedural Framework

---

[45] *Id.*

[46] *Id.*

[47] *Coleman v. Dept. of Labor*, 288 A.2d 285, 288 (Del. Super. 1972).

[48] *McCoy*, 1996 WL 111126 at *3.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Coleman*, 288 A.2d at 288.

7

A former employee who was terminated for just cause may file a claim for benefits under the Act. The General Assembly has established a due process framework by which the Department of Labor ("Department") must deny such an individual benefits under the Act.

> If the last employer timely files a completed separation notice in accordance with § 3317 of this title and the employer's statement on the separation notice does raise a potentially disqualifying issue as to the reason for the claimant's separation, the claim shall be referred to a representative of the Department . . . ("the Claims Deputy"), who shall examine the claim and on the basis of the facts found by the Claims Deputy shall initially determine the individual's qualification . . . and issue a determination in which it is determined whether or not such claim is valid."[53]

The Claims Deputy's determination becomes final unless either the Department or the claimant appeal the decision to award or deny benefits within ten calendar days.[54] If appealed, an appeals referee, "after affording the parties reasonable opportunity for fair hearing," will either affirm, reverse, or alter the decision of the deputy.[55] After the referee renders a decision, the parties are given notice of the decision and the reason(s) for the outcome.[56] The referee's decision becomes final unless either party appeals within 10 calender days of its rendering.[57]

If appealed, the referee's decision is reviewed by the UIAB.[58] "The [UIAB] may on its own motion, affirm, modify, or reverse any decision of [the referee] on the basis of the evidence previously submitted to [the referee] or it may permit any of the parties to such decision to initiate

---

[53] 19 *Del. C.* §3318 (a).

[54] 19 *Del. C.* §3318 (b).

[55] 19 *Del. C.* §3318 (c).

[56] *Id.*

[57] *Id.*

[58] *Id.*

8

further appeal before it."[59]  The UIAB's decision becomes final unless one of the parties appeals to the Superior Court in the county where the claimant resides or where its former employer's place of business is located.[60]

**Application**

There are sufficient facts in the record demonstrating Claimant was terminated from employment for just cause.  Claimant was terminated for insubordination and using profanity towards here supervisors.  Employer's company policy clearly states that use of profanity and insubordination are grounds for discipline.  The company policy also notes that discharge from employment is a possible consequence for the violation of company policies.  The record shows that Claimant received Employer's policy in both English and Creole and signed an acknowledgment that she received and understood the policy.

As stated above, a violation of a company policy can constitute just cause.  Based on the record, Employer had a standard of conduct, under those rules insubordination and profanity were prohibited, and Claimant had actual notice of both what conduct was prohibited and the potential consequences.  Claimant's verbal abuse of her supervisors in front of other employees and prospective employees in response to them merely giving her an oral warning for accidentally allowing a chicken bone to pass her on the line was in clear dereliction with Employer's interest, and her duties and expected standard of conduct as an employee.  It is clear Claimant had a reckless indifference for the consequences of her actions, which is exemplified through her objectionable response to such a minute disciplinary action.

---

[59] 19 *Del. C.* §3320 (a).

[60] 19 *Del. C.* §3323 (a).

Claimant asserts two issues in her brief that the Court would like to briefly address. First, Claimant declares she was deprived due process. Three separate tribunals, one of which is this Court, have reviewed her file and record. Claimant took complete and full andvantage of her due process rights by opting to hold two hearings at both the Referee and UIAB levels. She has received a complete review of the record by this Court. Just because Claimant disagrees with the factual determination that she was terminated for just cause and is not entitled to unemployment benefits does not me her due process rights were violated.

Lastly, Claimant declares that she was discriminated against by Employer based on her age, her high blood pressure (i.e., disability), or both. This is not the proper avenue by which to assert that claim. As such, the Court will not consider this claim.

### Conclusion

Based on the several eyewitness accounts presented at the two hearings, and the fact that Claimant received and acknowledged that she received Employer's employment policy, Employer has met its burden of proving Claimant's misconduct constituted wilful and wanton conduct and that her employment was terminated for just cause. Therefore, the Court **AFFIRMS** the decision of the UIAB; Claimant was properly denied Unemployment Insurance Benefits.

Very truly yours,


*/s/ T. Henley Graves*


T. Henley Graves

10